UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

| | |
|---|---|
| CASIE JO MCGEE and SARAH ELIZABETH ADKINS; JUSTIN MURDOCK and WILLIAM GLAVARIS; and NANCY ELIZABETH MICHAEL and JANE LOUISE FENTON, individually and as next friends of A.S.M., a minor child; | No. 3:13-cv-24068 |
| *Plaintiffs,* | |
| v. | |
| KAREN S. COLE, in her official capacity as CABEL COUNTY CLERK; and VERA J. MCCORMICK, in her official capacity as KANAWHA COUNTY CLERK; | |
| *Defendants,* | |
| and | |
| STATE of WEST VIRGINIA, *ex rel.* PATRICK MORRISSEY, ATTORNEY GENERAL, | |
| *Intervenor.* | |

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiffs Casie Jo McGee and Sarah Elizabeth Adkins; Justin Murdock and William Glavaris; and Nancy Elizabeth Michael and Jane Louise Fenton (collectively, "Adult Plaintiffs"), individually and as next friends of A.S.M., submit the following brief in support of their motion for summary judgment.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................1

ARGUMENT ..................................................................................................................1

I.    The Marriage Ban Infringes Adult Plaintiffs' Fundamental Rights and All
      Plaintiffs' Liberty Interests in Family Integrity and Association and Thus Violates
      the Guarantee of Due Process in the Fourteenth Amendment. ............................................1

      A.    Adult Plaintiffs and Other Lesbian and Gay Individuals Have a
            Fundamental Right to Marry the Spouse of Their Choosing Free of
            Unwarranted Interference by the State. ................................................2

      B.    In Keeping with the Right to Autonomy in Deciding Whether and Whom to
            Marry, West Virgina Imposes Very Few Restriction on Adults in Different-
            Sex Relationships Who Wish to Marry. ................................................3

      C.    The Scope of a Fundamental Right or Liberty Interest Under the Due
            Process Clause Does Not Depend on Who Is Exercising that Right. ....................4

      D.    Marriage is Not a Static Institution, But Has Transformed Over Time To
            Reflect Society's Evolving Needs and Values..........................................5

      E.    The Marriage Ban Infringes Upon All Plaintiffs' Liberty Interests in Family
            Integrity and Association. ..............................................................8

      F.    The Marriage Ban is Subject to Strict Scrutiny. .......................................9

II.   The Marriage Ban Denies Equal Protection of the Law...................................... 9

      A.    The Marriage Ban is Subject to Heightened Scrutiny Because it
            Discriminates Based on Both Sexual Orientation and Sex, and
            Discriminates with Respect to the Exercise of Fundamental Liberty
            Interests..................................................................................9

III.  The Marriage Ban Is Unconstitutional Under Any Standard of Review. ..........................12

      A.    The Marriage Ban Cannot Be Justified by an Asserted Interest in
            Maintaining a Traditional Definition of Marriage. ....................................13

      B.    There Is No Rational Relationship Between the Marriage Ban and any
            Asserted Interest Related To Procreation or the Promotion of Optimal
            Parenting.. ............................................................................14

     C.     No Legitimate Interest Overcomes the Primary Purpose and Practical Effect of the Marriage Ban to Disparage and Demean Same-Sex Couples and Their Families. ........................................................................................17

IV.     A.S.M.'s Constitutional Rights Are Violated by the Marriage Ban. ................................19

CONCLUSION ........................................................................................................................20

CERTIFICATE OF SERVICE ................................................................................................22

## TABLE OF AUTHORITIES

**Cases**                                                                                         **Page**

*Allen v. Allen*, 126 W. Va. 415, 28 S.E.2d 829 (1944) ...................................................... 4

*Baker v. Vermont*, 744 A.2d 864 (Vt. 1999) ................................................................. 18

*Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001) .................................. 13

*Bowers v. Hardwick*, 478 U.S. 186 (1986) ......................................................... 5, 9, 10

*Brown v. Board of Education of Topeka*, 347 U.S. 483 (1954) ................................. 19-20

*Califano v. Goldfarb*, 430 U.S. 199 (1977) ........................................................... 7, 11

*City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985) .......................... 12, 13, 14

*Clark v. Jeter*, 486 U.S. 456 (1988) ......................................................................... 20

*Dold's Trustee v. Geiger's Adm'r*, 43 Va. 98 (1845) .................................................... 6

*Eisenstadt v. Baird*, 405 U.S. 438 (1972) ........................................................... 12, 16

*Golinski v. Office of Personnel Management*, 824 F. Supp. 2d 968 (N.D.Cal. 2012) .................................................................. 5, 10, 11, 14, 15, 17

*Gomez v. Perez*, 409 U.S. 535 (1973) ...................................................................... 20

*Goodridge v. Dep't of Pub. Health*, 798 N.E.2d 941 (Mass. 2003) ....................... 14, 15

*Griswold v. Connecticut*, 381 U.S. 479 (1965) ............................................................ 8

*Hastings v. Douglass*, 249 F. 378 (D. W. Va. 1918) .................................................... 4

*Heller v. Doe by Doe*, 509 U.S. 312 (1993) ............................................................... 14

*Hernandez v. Robles*, 855 N.E.2d 1 (N.Y. 2006) ...................................................... 15

*Hodgson v. Minnesota*, 497 U.S. 417 (1990) .............................................................. 2

*Howard v. Child Welfare Agency Rev. Bd.*, Nos. 1999-9881, 2004 WL 3154530, and 2004 WL 3200916, (Ark. Cir. Ct. Dec. 29, 2004), *aff'd sub nom. Dep't of Human Servs. v. Howard*, 238 S.W.3d 1 (Ark. 2006) ......................................... 17

*In re Adoption of Doe*, 2008 WL 5006172 (Fla. Cir. Ct. Nov. 25, 2008), *aff'd sub nom. Fla. Dep't of Children & Families v. Adoption of X.X.G.*, 45 So.3d 79 (Fla. Dist. Ct. App. 2010) ....................................................................... 17

*In re Balas*, 449 B.R. 567 (Bankr. C.D. Cal. 2011) .................................................................. 11

*In re Clifford K.*, 217 W. Va. 625, 619 S.E.2d 138 (2005) ........................................................ 17

*In re Marriage Cases*, 183 P.3d 384 (2008) .................................................... 5, 8, 11, 15

*In re Visitation & Custody of Senturi*, 221 W. Va. 159, 652 S.E.2d 490 (2007) .......................... 17

*J.E.B. v. Ala. ex rel. T.B.*, 511 U.S. 127 (1994) .................................................................. 11

*Kerrigan v. Comm'r of Pub. Health*, 957 A.2d 407 (Conn. 2008) ........................................ 11, 14

*Kitchen v. Herbert*, No. 2:13-cv-217, 2013 WL 6697874 (D. Utah Dec. 20, 2013) .... 5, 14, 15, 16

*Lawrence v. Texas*, 539 U.S. 558 (2003) .......................................................... 4, 5, 7, 8, 9, 14, 19

*Levy v. Louisiana*, 391 U.S. 68 (1968) ...................................................................................... 20

*Loving v. Virginia*, 388 U.S. 1 (1967) .......................................................... 2, 5, 6, 8, 11

*M.S.P. v. P.E.P.*, 178 W. Va. 183, 358 S.E.2d 442 (1993) ........................................................ 16

*Mathews v. Lucas*, 427 U.S. 495 (1976) ................................................................................... 20

*McLaughlin v. Florida*, 379 U.S. 184 (1964) ............................................................................ 11

*Miss. Univ. for Women v. Hogan*, 458 U.S. 718 (1982) ............................................................. 11

*Moore v. City of East Cleveland*, 431 U.S. 494 (1977) ........................................................... 2, 9

*Pedersen v. Office of Personnel Mgmt.*, 881 F. Supp. 2d 294 (D. Conn. 2012) ......... 10, 11, 15, 17

*Perry v. Schwarzenegger*, 704 F. Supp. 2d 921 (N.D. Cal. 2010), *appeal dismissed sub nom. Perry v. Brown*, 725 F.3d. 1140 (9th Cir. 2013) ........................... 5, 11, 17

*Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510 (1925) ...................................................................................................................... 9

*Planned Parenthood v. Casey*, 505 U.S. 833 (1992) .................................................................... 8

*Reno v. Flores*, 507 U.S. 292 (1993) ........................................................................................... 9

*Roberts v. United States Jaycees*, 468 U.S. 609 (1984) ............................................................... 2

*Romer v. Evans*, 517 U.S. 620 (1996) .......................................................... 12, 13, 14, 16

*Rowsey v. Rowsey*, 174 W. Va. 692, 329 S.E.2d 57 (1985) ...................................................... 16-17

*Santosky v. Kramer*, 455 U.S. 745 (1982) ................................................................................... 8

*Skinner v. Oklahoma*, 316 U.S. 535 (1942) ................................................................ 12

*State ex rel. Kutil v. Blake*, 223 W. Va. 711, 679 S.E.2d 310 (2009) ........................... 17

*Stewart v. Vandervort*, 34 W. Va. 524, 12 S.E. 736 (1890) ........................................... 6

*Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810 (4th Cir. 1995) ...................... 16

*Thomasson v. Perry*, 80 F.3d 915 (4th Cir. 1996) ................................................... 9, 10

*Turner v. Safley*, 482 U.S. 78 (1987) ................................................................. 4, 5, 19

*United States Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973) ........................ 12, 13, 14

*United States v. Virginia*, 518 U.S. 515 (1996) ........................................................ 11

*United States v. Windsor*, 133 S. Ct. 2675 (2013) .................... 8, 12, 13, 14, 15, 18, 19

*Varnum v. Brien*, 763 N.W.2d 862 (Iowa 2009) ........................................ 11, 14, 15, 17

*Veney v. Wyche*, 293 F.3d 726 (4th Cir. 2002) ..................................................... 9, 10

*Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252 (1977) ...................... 13

*Weber v. Aetna Cas. & Sur. Co.*, 406 U.S. 164 (1972) ............................................... 20

*Webster v. Reproductive Health Service*, 492 U.S. 490 (1989) ...................................... 2

*Weinberger v. Wiesenfeld*, 420 U.S. 636 (1975) ........................................................ 7

*Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012), *aff'd* 133 S. Ct. 2675 (2013) .......................................................................... 10, 11, 15, 17

*Zablocki v. Redhail*, 434 U.S. 374 (1978) .......................................................... 2, 5

**Statutes**

W. Va. Code § 16-5-10(f) .......................................................................... 19

W. Va. Code § 42-1-6 ............................................................................... 19

W. Va. Code § 42-3-1 ............................................................................... 19

W. Va. Code § 48-1-18 (1966) ...................................................................... 6

W. Va. Code § 48-2-1 (1930) ....................................................................... 3

W. Va. Code § 48-2-3 (1930) ....................................................................... 4

W. Va. Code § 48-2-104 ............................................................................. 1

W. Va. Code § 48-2-4(a)(10) (1985 cum. supp.)............................................................... 7

W. Va. Code § 48-2-401 ...................................................................................................... 1

W. Va. Code § 48-2-603 ...................................................................................................... 1

W. Va. Code § 48-3-103(a)(3)(C)....................................................................................... 3

W. Va. Code § 48-7-103 .................................................................................................... 19

W. Va. Code § 48-8-101 .................................................................................................... 19

W. Va. Code § 48-9-102 .................................................................................................... 19

W. Va. Code § 48-11-101 .................................................................................................. 19

W. Va. Code § 48-14-101 .................................................................................................. 19

W. Va. Code § 48-22-110 .................................................................................................. 19

W. Va. Code ch. 64, § 1 (1868) ..................................................................................... 3, 6

W. Va. Code ch. 64, § 5 (1868) ......................................................................................... 7

**Rules**

Fed. R. Civ. P. ...................................................................................................................... 1

**Other Authorities**

*Ban on Same-Sex Marriages Proposed in House*, Charleston Daily Mail, Feb. 17,
1999................................................................................................................................ 18

Carlos A. Ball, *The Blurring of the Lines: Children and Bans on Interracial
Unions and Same-Sex Marriage*, 76 FORDHAM L. REV 2733 (2008) ...................... 6

Chemerinsky, Const. Law Principles and Policies, § 10.1 ....................................... 12

Donna J. Spindel, *Women's Legal Rights in West Virginia*, 1863-1984, *in* 51 West
Virginia History 29 (1992).............................................................................................. 6

*Hollingsworth v. Perry*, No. 12-144, and *United States v. Windsor*, No. 12-307,
Brief of the American Sociological Ass'n, in Support of Respondent Kristin
M. Perry and Respondent Edith Schlain Windsor, 2013 WL 840004 (Feb. 28,
2013) .............................................................................................................................. 16

Jennifer Bundy, *Underwood Against Same-Sex Marriage*, Charleston Gazette,
     Jan. 13, 2000 ............................................................................................................ 18

Karen Fischer, *W.Va. Bill Was Reaction to Vt. Ruling*, Charleston Daily Mail, Mar
     21, 2000.................................................................................................................... 18

Nancy F. Cott, A History of Marriage and the Nation (Harvard Univ. Press 2000) ...................... 6

Sau Chan, *Bills on Gay Issues Divide Legislators*, Charleston Gazette, Mar. 3,
     1996.......................................................................................................................... 18

*United States v. Windsor*, No. 12-307, Brief of the American Psychological
     Association, *et al.*, as *Amici Curiae* on the Merits in Support of Affirmance,
     2013 WL 871958 (Mar. 1, 2013) ............................................................................ 16

## INTRODUCTION

This case involves the exclusion of same-sex couples and their children in West Virginia from civil marriage. Plaintiffs are three committed same-sex couples who wish to marry, and the child of one of the couples who brings suit because West Virginia law deprives him of having married parents. West Virginia bars same-sex couples and their children from marriage by three statutory provisions, W. Va. Code §§ 48-2-104, 48-2-401, 48-2-603 (collectively hereinafter the "marriage ban" or "the ban"). Plaintiffs' complaint raises two claims: that the marriage ban violates the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment. The parties in this case agree that these claims can and should be resolved as a matter of law on summary judgment. Federal Rule of Civil Procedure 56 "allows a party to move for summary judgment at any time, even as early as the commencement of the action." Fed. R. Civ. P. 56 Advisory Committee Notes for 2009 Amendments. Accordingly, Plaintiffs seek summary judgment on both claims as to all defendants.

## ARGUMENT

I.    **The Marriage Ban Infringes Adult Plaintiffs' Fundamental Rights and All Plaintiffs' Liberty Interests in Family Integrity and Association and Thus Violates the Guarantee of Due Process in the Fourteenth Amendment.**

The marriage ban violates Adult Plaintiffs' due process guarantee by denying each the fundamental right to marry the person he or she loves, and infringes upon all Plaintiffs' protected liberty interests in family integrity and association. Adult Plaintiffs wish to express the nature, depth, and quality of their lifelong commitment in the way that they, their family, their friends, and society at large best understand. *See* SUF ¶¶ 8, 25. They wish to protect each other, and their children, in a host of tangible ways through marriage. *Id.* at ¶¶ 3-5, 9, 13, 15, 17, 19-20, 22-23, 24. Those Adult Plaintiffs who have or wish to have children seek to ensure that their children do not grow up feeling as though their family is less legitimate than other families. *Id.* at ¶¶ 15, 21.

Above all, they wish to marry because they love each other, and because they wish to spend the rest of their lives committed to each other. *Id.* at ¶¶ 1, 6, 8, 11. Adult Plaintiffs' liberty interests in marrying the person each one loves are no different from other peoples' interests in marital autonomy; marriage benefits spouses and their children in both tangible and intangible ways that are equally important to same-sex and different-sex couples and their families.

A.   **Adult Plaintiffs and Other Lesbian and Gay Individuals Have a Fundamental Right to Marry the Spouse of Their Choosing Free of Unwarranted Interference by the State.**

The right to marry long has been recognized as a fundamental right, protected under the due process guarantee, because deciding whether and whom to marry is exactly the kind of personal matter about which government should have little say. *Webster v. Reproductive Health Service,* 492 U.S. 490, 564-65 (1989) ("*freedom of personal choice* in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment") (emphasis added) (citation omitted); *Moore v. City of East Cleveland,* 431 U.S. 494, 499 (1977); *Zablocki v. Redhail,* 434 U.S. 374, 387 (1978) (burden on the right to marry unconstitutional because it affected individuals' "*freedom of choice* in an area in which we have held such freedom to be fundamental") (emphasis added). Because the right to make personal decision central to marriage would be meaningless if government dictated one's marriage partner, courts have placed special emphasis on protecting one's free choice of spouse. "[T]he regulation of constitutionally protected decisions, such as where a person shall reside or whom he or she shall marry, must be predicated on legitimate state concerns other than disagreement with the choice the individual has made." *Hodgson v. Minnesota,* 497 U.S. 417, 435 (1990); *see also Loving v. Virginia,* 388 U.S. 1, 12 (1967) ("Under our Constitution, the freedom to marry, or not marry, a person of another race resides with the individual and cannot be infringed by the State."); *Roberts v. United States Jaycees,* 468 U.S. 609, 620 (1984) ("[T]he Constitution

2

undoubtedly imposes constraints on the State's power to control the selection of one's spouse . . .

.").

**B.      In Keeping with the Right to Autonomy in Deciding Whether and Whom to Marry, West Virginia Imposes Very Few Restrictions on Adults in Different-Sex Relationships Who Wish to Marry.**

Consistent with the autonomy protected by the due process guarantee, West Virginia all

but stays out of each individual's decision whether and whom to marry – provided that he or she

selects someone of a different sex. A person may marry someone of a different sex who is of a

different religion, despised by his or her parents, with a criminal record, or a history of abuse.

West Virginia also permits spouses to determine for themselves the *purposes* marriage serves

and the form it takes. A couple may have children but they need not and often do not. Spouses

need not pass a fertility test, intend to procreate, be of childrearing age, have any parenting skills,

or account for any history of childrearing or support.

That the right to marry in West Virginia has never been conditioned on procreation is

illustrated through West Virginia's annulment and divorce statutes. In West Virginia, as across

the United States, annulment has never been allowed for mere infertility or sterility; for an

annulment, the spouse had to be completely incapable of sexual intercourse.[1] But even then, such

a marriage was merely voidable, not void. *See, e.g.*, W. Va. Code ch. 64, § 1 (1868); W. Va.

Code § 48-2-1 (1930). Heterosexual West Virginian couples who are incapable of engaging in

---

[1] Under the State's 1868 marriage laws, an annulment could be obtained where, at the time the marriage began, "either of the spouses was . . . incapable from physical causes of entering into the marriage state [i.e., have intercourse]." W. Va. Code ch. 64, § 1 (1868). The statute was slightly reworded in 1930 to say that an annulment could be obtained where "either of the parties was . . . incapable, because of natural or incurable impotency of body, of entering into the marriage state." W. Va. Code § 48-2-1 (1930). This remains the language to this day. W. Va. Code § 48-3-103(a)(3)(C). "Impotence" means inability to have intercourse, as distinguished from the terms "infertile" and "sterile," which mean the inability to reproduce.

3

sexual intercourse (let alone actually procreating) have always had the right to choose to get

married, and the State has always recognized such marriages as valid.[2]

Indeed, that the right to marry is not conditioned on procreation was recognized expressly

in *Turner v. Safley*, 482 U.S. 78, 95-96 (1987) (marriage is a fundamental right for prisoners

even though some may never have an opportunity to "consummate" the marriage; "important

attributes" of marriage include that it is an "expression . . . of emotional support and public

commitment," and for some, an "exercise of religious faith as well as personal dedication," "a

precondition to the receipt of government benefits . . . [including] less tangible benefits," such as

"legitimization of children born out of wedlock"); *cf. Lawrence v. Texas*, 539 U.S. 558, 578

(2003) ("[D]ecisions by married persons, concerning the intimacies of their physical relationship,

even when not intended to produce offspring, are a form of 'liberty' protected by the Due

Process Clause of the Fourteenth Amendment."). Thus, in deference to personal autonomy, West

Virginia minimally regulates entry into marriage and the shape it takes for any two persons.

Here, two of the three plaintiff couples are rearing children. But the absence of children, now or

in the future, does not vitiate the basic liberty and fundamental right to marry all people enjoy.

### C.     The Scope of a Fundamental Right or Liberty Interest Under the Due Process Clause Does Not Depend on Who Is Exercising that Right.

Some opponents of marriage for same-sex couples attempt to reframe the fundamental

---

[2] Only the parties to a marriage had standing to seek annulment, so they could choose to stay married regardless of whether outside parties agreed. *See Hastings v. Douglass*, 249 F. 378, 383 (D. W. Va. 1918). Indeed, a spouse would actually be prevented from seeking annulment if he or she "had knowledge" of the spouse's impotency at the time of the marriage. *See, e.g.*, W. Va. Code § 48-2-3 (1930). As such, the State not only *allowed* sexless heterosexual marriages, but sometimes *refused* to let couples dissolve them. Likewise, in one case where a couple agreed before marriage not to have children, the husband was prevented from seeking annulment on the grounds of lack of intercourse. *Allen v. Allen*, 126 W. Va. 415, 425, 28 S.E.2d 829, 833 (1944) ("[The wife] may have intended to avoid having children, if possible, but if so, the husband cannot complain, for, clearly, in the beginning at least, he was of the same mind.").

right to marry as a "new" right of "same-sex marriage" in an effort to avoid the binding

precedent described above, which mandates respect for the fundamental right to marry. *See*

*Kitchen v. Herbert*, No. 2:13-cv-217, 2013 WL 6697874, at *15-16 (D. Utah Dec. 20, 2013)

(describing and rejecting such a tactic). However, the scope of a fundamental right is defined by

the *attributes of the right itself*, and not the identity of the people who seek to exercise it or who

have been excluded from doing so in the past. The Supreme Court has rejected attempts to

reframe claimed fundamental rights and liberty interests by re-defining them narrowly to include

only those who have exercised them in the past.[3] Thus, Adult Plaintiffs' claimed right to marry

can no more be described as a claimed right to "same-sex marriage" than the right in *Loving*, 388

U.S. 1, was the right to "interracial marriage," or the right in *Zablocki v. Redhail*, 434 U.S. 374

(1978), was to "deadbeat parent marriage," or the right in *Turner*, 482 U.S. 78, was to "prisoner

marriage." *See Golinski v. Office of Personnel Management*, 824 F. Supp. 2d 968, 982 n.5

(N.D.Cal. 2012) (citing *Loving*, 388 U.S. at 12; *Turner*, 482 U.S. at 94-96; *accord In re*

*Marriage Cases*, 183 P.3d 384, 421 n.33 (2008); *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921,

993 (N.D. Cal. 2010), *appeal dismissed sub nom. Perry v. Brown*, 725 F.3d. 1140 (9th Cir. 2013)

("Plaintiffs do not seek recognition of a new . . . 'right to same-sex marriage' . . . . Rather,

plaintiffs ask California to recognize their relationships for what they are: marriages.").

    **D.**    **Marriage is Not a Static Institution, But Has Transformed Over Time To
Reflect Society's Evolving Needs and Values.**

---

[3] The argument that same-sex couples seek a "new" right rather than the same right exercised by others makes the same mistake that the U.S. Supreme Court made in *Bowers v. Hardwick*, 478 U.S. 186 (1986), and corrected in *Lawrence v. Texas*. In a challenge by a gay man to Georgia's sodomy statute, the *Bowers* Court recast the right at stake from a right, shared by all adults, to consensual intimacy with the person of one's choice, to a claimed "fundamental right" of "homosexuals to engage in sodomy." *Lawrence*, 539 U.S. at 566-67 (quoting *Bowers*, 478 U.S. at 190). In overturning *Bowers*, the *Lawrence* Court held that its constricted framing of the issue in *Bowers* "fail[ed] to appreciate the extent of the liberty at stake," *Lawrence*, 539 U.S. at 567.

Some opponents of marriage for same-sex couples have argued, as Defendant Cole has implied (Dkt. No. 32 at 8), that the meaning of marriage is static or incapable of becoming more inclusive, or that the "essence" of marriage excludes same-sex couples. However, this argument ignores that marriage laws, through court decisions and legislation, have undergone significant changes over time and are virtually unrecognizable from the way they operated a century ago. *See, generally,* Nancy F. Cott, A History of Marriage and the Nation (Harvard Univ. Press 2000).

West Virginia marriage law has transformed most dramatically with respect to discriminatory racial restrictions that once were widely accepted elements of marriage.[4] Until *Loving v. Virginia*, 388 U.S. 1 (1967), West Virginia criminally punished any white person who married someone of a different race. *See* W. Va. Code § 48-1-18 (1966). Today, consenting adults can choose whom to marry, regardless of their race.

West Virginia's marriage laws also have rejected differential treatment based on gender. Previously, under the doctrine of coverture, women lost their legal personhood and most of their property rights once they were married. *See* Donna J. Spindel, *Women's Legal Rights in West Virginia*, 1863-1984, *in* 51 West Virginia History 29, 30 (1992); *Dold's Trustee v. Geiger's Adm'r*, 43 Va. 98, 102-03 (1845). Today, West Virginia and federal law treat both spouses

---

[4] As early as 1691, West Virginia (then a part of Virginia) banned interracial marriage. *See* Carlos A. Ball, *The Blurring of the Lines: Children and Bans on Interracial Unions and Same-Sex Marriage*, 76 FORDHAM L. REV 2733, 2740 (2008). The Virginia anti-miscegenation law was designed to "'prevent . . . that abominable mixture and spurious issue which hereafter may encrease in this dominion, as well by negroes, mulattoes, and Indians intermarrying with English, or other white women, as by their unlawfull accompanying with one another.'" *Id.* (quotation omitted). In 1863, West Virginia split from Virginia and joined the Union as a separate state. In 1867, West Virginia passed its own marriage law that slightly softened the State's stance on interracial marriages. Rather than being absolutely void, such marriages were made voidable by the parties. W. Va. Code ch. 64, § 1 (1868); *see Stewart v. Vandervort*, 34 W. Va. 524 , 12 S.E. 736, 738 (1890).

equally and in gender-neutral fashion with respect to marriage, and gender-neutral treatment for marital partners is constitutionally required. *See Califano v. Goldfarb*, 430 U.S. 199 (1977); *Weinberger v. Wiesenfeld*, 420 U.S. 636 (1975).

West Virginia's divorce law has also evolved from initially failing to provide for divorce altogether, to permitting divorce today based on the "irreconcilable differences of the parties." W. Va. Code. § 48-2-4(a)(10) (1985 cum. supp.), highlighting the State's movement toward a consent-based view of marriage, in which marriage is a voluntary union of equal partners.[5] Thus, the history of West Virginia's marriage laws shows a rejection of discriminatory entry requirements and a steady progression towards a consent-based view of marriage, in which adults are free to marry the partner of their choice, spouses have equal legal standing within their relationship and in their dealings with others, and, if necessary, spouses may divorce when they agree they no longer wish to remain married. Marriage today is a vastly changed institution from what it historically was, and yet it remains both a cherished value and the sole universally-understood and respected way in our society of communicating that two people are family, love each other, and have made a lifetime commitment of mutual responsibility. Thus, as much as marriage has changed, the profound liberty interests in marriage have *not*, and are shared by all individuals. Where such liberty interests are at stake, "history and tradition are the starting point but not in all cases the ending point of the substantive due process inquiry." *Lawrence*, 539 U.S. at 572 (citation omitted).[6]

---

[5] Grounds for divorce initially were limited but included adultery, incurable impotency, abandonment, and imprisonment of a spouse. W. Va. Code ch. 64, § 5 (1868).

[6] While courts use history and tradition to identify the interests that due process protects, they do not carry forward historical limitations, either traditional or arising by operation of prior law, on which Americans may exercise a right once that right is recognized as one that due process

E.    **The Marriage Ban Infringes Upon All Plaintiffs' Liberty Interests in Family Integrity and Association.**

By denying Adult Plaintiffs access to marriage, the marriage ban infringes not only their fundamental right to marry, but also a host of other related fundamental liberty interests. The marriage ban burdens Adult Plaintiffs' protected interest in autonomy over "personal decisions relating to . . . family relationships," *Lawrence*, 539 U.S. at 573; *see also Santosky v. Kramer*, 455 U.S. 745, 753 (1982), and additionally impairs Adult Plaintiffs' ability to identify themselves and to participate fully in society as married couples, thus burdening their fundamental liberty interests in intimate association and self-definition. *See Griswold v. Connecticut*, 381 U.S. 479, 482-83 (1965); *United States v. Windsor*, 133 S. Ct. 2675, 2689 (2013) (marriage permits same-sex couples "to define themselves by their commitment to each other" and "so live with pride in themselves and their union and in a status of equality with all other married persons").

In addition, the ban interferes with constitutionally protected interests in family integrity and association by precluding all Plaintiffs from securing legal recognition of their parent-child relationships through established legal mechanisms available to married parents (*e.g.,* the spousal presumption of parenthood, stepparent adoption, and other marital parentage protections) and impairs Nancy's and Jane's ability to make decisions with regard to A.S.M.'s school enrollment, travel, health care, and other matters, thus infringing their fundamental liberty interest in

protects. "'Fundamental rights, once recognized, cannot be denied to particular groups on the ground that these groups have historically been denied those rights.'" *In re Marriage Cases*, 183 P.3d at 430 (quotation omitted); *see also Planned Parenthood v. Casey*, 505 U.S. 833, 847-48 (1992) ("[I]nterracial marriage was illegal in most States in the 19th century, but the Court was no doubt correct in finding it to be an aspect of liberty protected against state interference by the substantive component of the Due Process Clause in *Loving* . . . ."); *Lawrence*, 539 U.S. at 577-78 ("[N]either history nor tradition could save a law prohibiting miscegenation from constitutional attack.") (citation omitted).

"direct[ing] the upbringing and education" of their child. *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534-35 (1925). Such infringements on the bonds between children and the parents raising them violate the core of the substantive guarantees of the Due Process Clause as recognized by the Supreme Court. *Moore*, 431 U.S. at 503.

      **F.**    **The Marriage Ban is Subject to Strict Scrutiny.**

Because the marriage ban infringes upon Adult Plaintiffs' fundamental right to marry, it is subject to strict scrutiny and therefore constitutionally permissible only when "necessary to promote a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993) (a law restricting fundamental rights must be "narrowly tailored to serve a compelling state interest"). Because, as discussed below, the marriage ban cannot survive any level of scrutiny, the ban violates the Due Process guarantee of the U.S. Constitution.

**II.**    **The Marriage Ban Denies Equal Protection of the Law.**

      **A.**    **The Marriage Ban is Subject to Heightened Scrutiny Because it Discriminates Based on Both Sexual Orientation and Sex, and Discriminates With Respect to the Exercise of Fundamental Liberty Interests.**

Because the marriage ban targets West Virginians for exclusion from marriage based both on their sex and sexual orientation, and also discriminates with respect to exercise of rights deemed fundamental, the ban triggers a heightened level of equal protection review. The Supreme Court has never decided which level of scrutiny is applicable to classifications based on sexual orientation. There is no controlling law in this Circuit regarding the appropriate level of scrutiny for classifications based on sexual orientation; the only Fourth Circuit decisions to address the issue—*Thomasson v. Perry*, 80 F.3d 915, 928-29 (4th Cir. 1996) (en banc), and *Veney v. Wyche*, 293 F.3d 726, 732 (4th Cir. 2002)—relied in doing so on *Bowers v. Hardwick*, 478 U.S. 186 (1986), which has since been overruled in its entirety by *Lawrence*, 539 U.S. at 578

(*Bowers* "was not correct when it was decided and is not correct today").[7] By overruling *Bowers*, the Supreme Court in *Lawrence* necessarily abrogated *Thomasson*, *Veney*, and other decisions that relied on *Bowers* to foreclose the possibility of heightened scrutiny for sexual orientation classifications. *See Pedersen v. Office of Personnel Mgmt.*, 881 F. Supp. 2d 294, 312 (D. Conn. 2012); *Golinski v. U.S. Office of Personnel Mgmt.*, 824 F. Supp. 2d 968, 984 (N.D. Cal. 2012).

Lower courts without controlling post-*Lawrence* precedent on the issue must apply the criteria mandated by the Supreme Court to determine whether sexual orientation classifications should receive heightened scrutiny: A) whether the class has been historically "subjected to discrimination,"; B) whether the class has a defining characteristic that "frequently bears [a] relation to ability to perform or contribute to society," C) whether the class exhibits "obvious, immutable, or distinguishing characteristics that define them as a discrete group;" and D) whether the class is "a minority or politically powerless." *Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012) (quotations and citations omitted), *aff'd* 133 S. Ct. 2675 (2013). Of these considerations, the first two are the most important. *See id.* ("Immutability and lack of political power are not strictly necessary factors to identify a suspect class."); *accord Golinski*, 824 F. Supp. 2d at 987. As several federal and state courts have recently recognized, faithful application of those factors leads to the inescapable conclusion that sexual orientation classifications must be recognized as suspect or quasi-suspect and subjected to heightened scrutiny. *See, e.g., Windsor*,

---

[7] Like every other circuit court to address the issue before *Lawrence*, the Fourth Circuit in *Thomasson* reasoned that, if the government could constitutionally criminalize private, consensual sex between gay people, sexual orientation could not be considered a suspect or quasi-suspect classification for purpose of equal protection. *See Thomasson*, 80 F.3d at 928-29 ("Given that it is legitimate for Congress to proscribe homosexual acts, it is also legitimate for the government to seek to forestall these same dangers by trying to prevent the commission of such acts.") (citations omitted). In 2002, the Fourth Circuit relied on *Thomasson* as precedent without conducting an independent analysis. *See Veney*, 293 F.3d at 731 n.4.

699 F.3d at 181-85; *Golinski*, 824 F. Supp. 2d at 985-90; *Pedersen*, 881 F. Supp. 2d at 310-33;

*Perry*, 704 F. Supp. 2d at 997; *In re Balas*, 449 B.R. 567, 573-75 (Bankr. C.D. Cal. 2011)

(decision of 20 bankruptcy judges); *Varnum v. Brien*, 763 N.W.2d 862, 885-96 (Iowa 2009); *In*

*re Marriage Cases*, 183 P.3d at 441-44; *Kerrigan v. Comm'r of Pub. Health*, 957 A.2d 407, 425-

31 (Conn. 2008).

The marriage ban also warrants heightened scrutiny because it discriminates based on

sex; a person may marry only if the person's sex is different from that of the person's intended

spouse.[8] (For example, Nancy may not marry Jane because Nancy is a woman.) Such a

distinction requires heightened scrutiny. *United States v. Virginia*, 518 U.S. 515, 555 (1996);

*J.E.B. v. Ala. ex rel. T.B.*, 511 U.S. 127, 136 (1994).[9]

Finally, because the marriage ban discriminates against all Plaintiffs in their exercise of

their fundamental rights and liberty interests, the ban therefore is subject to strict scrutiny for this

--------

[8] West Virginia's restriction on marriage is no less invidious because it equally denies men and women the right to marry a same-sex life partner. *Loving* discarded "the notion that the mere 'equal application' of a statute containing racial classifications is enough to remove the classifications from the Fourteenth Amendment's proscription of all invidious racial discriminations." 388 U.S. at 8; *see also McLaughlin v. Florida*, 379 U.S. 184, 191 (1964) (equal protection analysis "does not end with a showing of equal application among the members of the class defined by the legislation"); *J.E.B*, 511 U.S. 127 (government may not strike jurors based on sex, even though such a practice, as a whole, does not favor one sex over the other). Nor was the context of race central to *Loving*'s holding, which expressly found that, even if race discrimination had not been at play and the Court presumed "an even-handed state purpose to protect the integrity of all races," Virginia's anti-miscegenation statute still was "repugnant to the Fourteenth Amendment." *Loving*, 388 U.S. at 12 n.11.

[9] The ban also enforces conformity with sex stereotypes, impermissibly requiring men and women to adhere to traditional marital roles as a condition of the right to marry. The Supreme Court has held this type of statutory sex stereotyping to be constitutionally impermissible. *See, e.g., Virginia*, 518 U.S. at 533 (justifications for gender classifications "must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females"); *Califano*, 430 U.S. at 317; *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724-25 (1982).

reason as well. *See Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942); Chemerinsky, Const. Law

Principles and Policies, § 10.1.

**III.    The Marriage Ban Is Unconstitutional Under Any Standard of Review.**

The marriage ban violates the Constitution's equal protection guarantee under any level

of review. "Even in the ordinary equal protection case calling for the most deferential of

standards, [the Court] insist[s] on knowing the relation between the classification adopted" and

an "independent and legitimate legislative end." *Romer v. Evans*, 517 U.S. 620, 632-33 (1996).

In addition, even when the government offers an ostensibly legitimate purpose, the court must

also examine the statute's connection to that purpose to assess whether it is too "attenuated" to

rationally advance the asserted governmental interest. *City of Cleburne v. Cleburne Living*

*Center, Inc.*, 473 U.S. 432, 446 (1985); *see, e.g., United States Dep't of Agric. v. Moreno*, 413

U.S. 528, 535-36 (1973); *Eisenstadt v. Baird*, 405 U.S. 438, 448-49 (1972).

By requiring that classifications be justified by an independent and legitimate purpose,

the Equal Protection Clause prohibits classifications from being drawn for "the purpose of

disadvantaging the group burdened by the law." *Romer*, 517 U.S. at 633; *see also Windsor*, 133

S. Ct. at 2693; *City of Cleburne*, 473 U.S. at 450; *Moreno*, 413 U.S. at 534. The Supreme Court

invoked this principle most recently in *Windsor* when it held that the principal provision of the

federal Defense of Marriage Act ("DOMA") violated equal protection principles because the

"purpose and practical effect of the law . . . [was] to impose a disadvantage, a separate status,

and so a stigma upon all who enter into same-sex marriages." *Windsor*, 133 S. Ct. at 2693. The

statute was not sufficiently connected to a legitimate governmental purpose because its

"interference with the equal dignity of same-sex marriages . . . was more than an incidental effect

of the federal statute. It was its essence." *Id.* The Supreme Court has sometimes described this

12

impermissible purpose as "animus" or a "bare . . . desire to harm a politically unpopular group." *Id.*; *see also Romer*, 517 U.S. at 633; *Cleburne*, 473 U.S. at 447; *Moreno*, 413 U.S. at 534. But an impermissible motive does not always require "malicious ill will." *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 374 (2001) (Kennedy, J., concurring). It can also take the form of "negative attitudes," *Cleburne*, 473 U.S. at 448, "fear," *id.*, "irrational prejudice," *id.* at 450, or "some instinctive mechanism to guard against people who appear to be different in some respects from ourselves," *Garrett*, 531 U.S. at 374 (Kennedy, J., concurring).[10]

West Virginia's marriage ban shares all the hallmarks of irrational discrimination that have been present in prior Supreme Court cases that struck down laws violating even the lowest level of equal protection scrutiny. Even if the Court does not apply heightened scrutiny (although it should), none of the likely proffered rationales for West Virginia's marriage ban can withstand constitutional review.

    **A.**    **The Marriage Ban Cannot Be Justified by an Asserted Interest in Maintaining a Traditional Definition of Marriage.**

In order to survive constitutional scrutiny, the marriage ban must be justified by some legitimate state interest other than simply maintaining a "traditional" definition of marriage. "Ancient lineage of a legal concept does not give it immunity from attack for lacking a rational

---

[10] In determining whether a law is based on such an impermissible purpose, the Court has looked to a variety of direct and circumstantial evidence, including the text of a statute and its obvious practical effects, *see, e.g.*, *Windsor*, 133 S. Ct. at 2693; *Romer*, 517 U.S at 633; *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266-68 (1977), statements by legislators during floor debates or committee reports, *see, e.g.*, *Windsor*, 133 S. Ct. at 2693; *Moreno*, 413 U.S. at 534-35, the historical background of the challenged statute, *see, e.g.*, *Windsor*, 133 S. Ct. at 2693; *Arlington Heights*, 429 U.S. at 266-68, and a history of discrimination by the relevant governmental entity, *see, e.g. Arlington Heights*, 429 U.S. at 266-68. Finally, even without direct evidence of discriminatory intent, the absence of any logical connection to a legitimate purpose can lead to an inference of an impermissible intent to discriminate. *See Romer*, 517 U.S. at 632; *Cleburne*, 473 U.S. at 448-50.

basis." *Heller v. Doe by Doe*, 509 U.S. 312, 326-27 (1993). "[T]imes can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress." *Lawrence*, 539 U.S. at 579.

Regarding laws that exclude same-sex couples from marriage, "the justification of 'tradition' does not explain the classification; it merely repeats it. Simply put, a history or tradition of discrimination—no matter how entrenched—does not make the discrimination constitutional." *Kerrigan*, 957 A.2d at 478 (citation omitted); *accord Goodridge v. Dep't of Pub. Health*, 798 N.E.2d 941, 961 n.23 (Mass. 2003); *Varnum*, 763 N.W.2d at 898; *see also Golinski*, 824 F. Supp. 2d at 993. Ultimately, "'preserving the traditional institution of marriage' is just a kinder way of describing the [s]tate's *moral disapproval* of same-sex couples," *Lawrence*, 539 U.S. at 601 (Scalia, J., dissenting) (emphasis in original), which is not a rational basis for perpetuating discrimination. *See Windsor*, 133 S. Ct. at 2692; *Romer,* 517 U.S. at 633; *Cleburne,* 473 U.S. at 450; *Moreno,* 413 U.S. at 534.

> **B.      There Is No Rational Relationship Between the Marriage Ban and any Asserted Interest Related To Procreation or the Promotion of Optimal Parenting.**

There is no rational connection between West Virginia's marriage ban and any asserted state interest in encouraging heterosexual couples to procreate responsibly within marriage, or in encouraging child-rearing by supposedly "optimal" parents. West Virginia law does not condition persons' right to marry on their abilities or intentions regarding having or rearing children, but permits those who are "sterile and the elderly," or simply uninterested in childbearing to marry. *See Lawrence,* 539 U.S. at 605 (Scalia, J., dissenting). Denying marriage to same-sex couples does not increase the number of children raised by married different-sex biological parents; any asserted connection between the marriage ban and the marital or procreative decisions of heterosexual couples defies logic. *See Kitchen,* 2013 WL 6697874, at

14

*25, *27; *Windsor*, 699 F.3d at 188; *Golinski*, 824 F. Supp. 2d at 998; *Pedersen*, 881 F. Supp. 2d at 340-41; *Varnum*, 763 N.W.2d at 901. The only effect that West Virginia's marriage ban has on children's well-being is that it *harms* the children of same-sex couples who are denied the protection of having married parents. *See, e.g.*, SUF ¶¶ 18-21; *Kitchen*, 2013 WL 6697874, at *26. Like the statute invalidated in *Windsor*, West Virginia's marriage ban serves only to "humiliate" the "children now being raised by same-sex couples" and "make[] it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives." *Windsor*, 133 S. Ct. at 2694; *see also, e.g.*, SUF ¶¶ 18-21. "Excluding same-sex couples from civil marriage will not make children of opposite-sex marriages more secure, but it does prevent children of same-sex couples from enjoying the immeasurable advantages that flow from the assurance of a stable family structure in which children will be reared, educated, and socialized." *Goodridge*, 798 N.E.2d at 964 (internal quotation marks and citation omitted)). Lesbian and gay couples have children through assisted reproduction and through adoption, and the government has just as strong an interest in encouraging such procreation and child-rearing in these families to take place in the context of marriage. *See Varnum*, 763 N.W.2d at 902; *In re Marriage Cases*, 183 P.3d at 433; *see also Pedersen*, 881 F. Supp. 2d at 339.[11]

---------------

[11] Some opponents of marriage for same-sex couples have argued that the purpose of marriage is to ensure that couples are in stable relationships in case they "accidentally procreate," and they argue that because same-sex couples cannot procreate by accident, it is rational that only different-sex couples are provided with the protections of marriage. *See, e.g., Hernandez v. Robles*, 855 N.E.2d 1, 7 (N.Y. 2006). This theory inverts federal rational basis analysis, which requires a rational connection between a legitimate governmental interest and the *denial* of a benefit to another; the relevant inquiry is whether the law's classification *excluding* same-sex couples bears a rational relationship to a legitimate governmental interest. Because West Virginia does not condition the right to marry on procreative ability, the State may not single out only same-sex couples and their children to exclude from marriage based on an "accidental

Opponents of marriage for same-sex couples also sometimes argue that excluding same-sex couples from marriage serves the purpose of promoting the ideal that children will be reared by "optimal parents," which they characterize as married, biological, different-sex parents. *See Kitchen,* 2013 WL 6697874, at \*25-26. First, as noted above, there is no link between the marriage ban and encouragement of procreation by anyone. Additionally, the overwhelming scientific consensus, based on decades of peer-reviewed scientific research, shows unequivocally that children raised by same-sex couples are just as well-adjusted as those raised by heterosexual couples.[12] This consensus has long been accepted by West Virginia courts, which have rejected the argument that parental sexual orientation is a basis for denying child custody, and acknowledged that same-sex couples are more than capable of properly raising children and establishing meaningful parental relationships with them. *See M.S.P. v. P.E.P.,* 178 W. Va. 183, 186-87, 358 S.E.2d 442, 445-46 (1993); *Rowsey v. Rowsey,* 174 W. Va. 692, 695, 329 S.E.2d 57,

---

procreation" theory. Under rational-basis review, it is not enough for the government to identify some difference between two classes; it must be "'a ground of difference having a fair and substantial relation to the object of the legislation.'" *Sylvia Dev. Corp. v. Calvert County, Md.,* 48 F.3d 810, 818 (4th Cir. 1995) (quotation omitted); *Romer,* 517 U.S. at 635; *see also Eisenstadt,* 405 U.S. at 449 (law "so riddled with exceptions" that the interest claimed by the government "cannot reasonably be regarded as its aim").

[12] This consensus has been recognized in formal policy statements and organizational publications by every major professional organization dedicated to children's health and welfare, including the American Academy of Pediatrics, American Academy of Child and Adolescent Psychiatry, the American Psychiatric Association, the American Psychological Association, the American Psychoanalytic Association, and the Child Welfare League of America. *See United States v. Windsor,* No. 12-307, Brief of the American Psychological Association, *et al.,* as *Amici Curiae* on the Merits in Support of Affirmance, 2013 WL 871958, at \*14-26 (Mar. 1, 2013) (discussing this scientific consensus); *Hollingsworth v. Perry,* No. 12-144, and *United States v. Windsor,* No. 12-307, Brief of the American Sociological Ass'n, in Support of Respondent Kristin M. Perry and Respondent Edith Schlain Windsor, 2013 WL 840004, at \*6-14 (Feb. 28, 2013).

16

60-61 (1985).[13] As numerous other courts have recognized, it is "accepted beyond serious debate" that children are raised just as "optimally" by same-sex couples as they are by different-sex couples. *See Perry*, 704 F. Supp. 2d at 980; *In re Adoption of Doe*, 2008 WL 5006172, at *20 (Fla. Cir. Ct. Nov. 25, 2008), *aff'd sub nom. Fla. Dep't of Children & Families v. Adoption of X.X.G.*, 45 So.3d 79 (Fla. Dist. Ct. App. 2010); *Howard v. Child Welfare Agency Rev. Bd.*, Nos. 1999-9881, 2004 WL 3154530, at *9 and 2004 WL 3200916, at *3-4 (Ark. Cir. Ct. Dec. 29, 2004), *aff'd sub nom. Dep't of Human Servs. v. Howard*, 238 S.W.3d 1 (Ark. 2006); *Varnum*, 763 N.W.2d at 899, n.26; *Golinski*, 824 F. Supp. 2d at 991. There is simply no rational connection between the marriage ban and the asserted governmental interest in optimal parenting. Children being raised by different-sex couples are unaffected by whether same-sex couples can marry, and children raised by same-sex couples will not end up being raised by different-sex couples because their current parents cannot marry. *See Golinski*, 824 F. Supp. 2d at 997; *accord Windsor*, 699 F.3d at 188; *Pedersen*, 881 F. Supp. 2d at 340-41; *Varnum*, 763 N.W.2d at 901.

### C. No Legitimate Interest Overcomes the Primary Purpose and Practical Effect of the Marriage Ban to Disparage and Demean Same-Sex Couples and Their Families.

The Supreme Court in *Windsor* recently reaffirmed that when the primary purpose and effect of a law is to harm an identifiable group, the law is unconstitutional regardless of whether the law may also incidentally serve some other neutral governmental interest. Because "[t]he

---

[13] *See also State ex rel. Kutil v. Blake*, 223 W. Va. 711, 722-23, 679 S.E.2d 310, 321-322 (2009) (inappropriate to remove a foster child from a same-sex couple for the purpose of allowing the child to grow up in a "traditional family" with a mother and father); *In re Visitation & Custody of Senturi*, 221 W. Va. 159, 167, 652 S.E.2d 490, 167 (2007); *In re Clifford K.*, 217 W. Va. 625, 646-47, 619 S.E.2d 138, 159-60 (2005) (a non-birth mother can intervene in a custody proceeding regarding the child born to her same-sex partner).

principal purpose [of DOMA was] to impose inequality, not for other reasons like governmental efficiency," "no legitimate purpose overcomes the purpose and effect to disparage and injure" same-sex couples and their families. *Windsor*, 133 S. Ct at 2694, 2696.

West Virginia's marriage ban was enacted because of, not in spite of, its adverse effect on same-sex couples. Passed by the legislature on March 11, 2000, and signed into law on April 4, 2000, the ban bears strong parallels to DOMA, the statute struck down in *Windsor*. Like DOMA, West Virginia's ban was motivated by the specter of states granting expanded rights to same-sex couples; it was prompted first by Hawaii litigation brought by same-sex couples seeking to marry,[14] and gained traction after the Vermont Supreme Court ruled that gay and lesbian couples should enjoy all the benefits and privileges afforded to heterosexual couples.[15] *Compare Windsor*, 133 S. Ct. at 2682 (impetus for DOMA was Hawaii litigation). Additionally, just like DOMA, where the legislative history impermissibly expressed "moral disapproval of homosexuality, and a moral conviction that heterosexuality better comports with traditional (especially Judeo–Christian) morality," *Windsor*, 133 S. Ct. at 2693, West Virginia proponents of the ban justified their support through moral condemnation of homosexuality.[16]

---

[14] Sau Chan, *Bills on Gay Issues Divide Legislators*, Charleston Gazette, Mar. 3, 1996, at 5C (quoting a legislative proponent as saying, "The sad thing is we may be forced to recognize homosexual marriages if we don't do something to rectify the law.")

[15] *See Baker v. Vermont*, 744 A.2d 864 (Vt. 1999); Karen Fischer, *W.Va. Bill Was Reaction to Vt. Ruling*, Charleston Daily Mail, Mar 21, 2000, at 1A.

[16] *Ban on Same-Sex Marriages Proposed in House*, Charleston Daily Mail, Feb. 17, 1999, at 2A (quoting a leading proponent as saying: "Homosexuality is an immoral and unhealthy lifestyle. It's not something our government should encourage or endorse. Until we pass this law, we are not going to be safe."); Jennifer Bundy, *Underwood Against Same-Sex Marriage*, Charleston Gazette, Jan. 13, 2000, at 9A; Karen Fischer, *W.Va. Bill Was Reaction to Vt. Ruling*, Charleston Daily Mail, Mar. 21, 2000, at 1A (quoting the Governor's Chief of Staff as saying, "It's a moral issue for [the Governor]. He just believes in family values and family traditions. It's an issue that needs to be addressed before it becomes a problem.")

In addition to the contemporaneous evidence of an impermissible purpose, the inescapable "practical effect" of West Virginia's marriage ban is "to impose a disadvantage, a separate status, and so a stigma upon" same-sex couples in the eyes of the state and the broader community. *Windsor*, 133 S. Ct at 2693. The ban "diminishes the stability and predictability of basic personal relations" of gay people and "demeans the couple, whose moral and sexual choices the Constitution protects." *Id* at 2694 (citing *Lawrence*, 539 U.S. 558 (2003)). Thus, even if there were a rational connection between the ban and a legitimate purpose (and there is not), that connection could not "overcome[] the purpose and effect to disparage and to injure" same-sex couples and their families. *Windsor*, 133 S. Ct at 2696.

## IV.   A.S.M.'s Constitutional Rights Are Violated by the Marriage Ban.

The marriage ban injures A.S.M. in both tangible and intangible ways. The ban denies him an economic safety net and other protections and government benefits automatically given to children of married parents, and his family has less money to spend on child-related expenses. W. Va. Code § 42-1-6 (children born outside marriage will be legitimized by subsequent marriage of parents); W. Va. Code §§ 16-5-10(f), 48-22-110 (children born within marriage are given presumptive parentage); *Turner*, 482 U.S. at 96 (a benefit of marriage is "legitimation of children born out of wedlock"); SUF ¶¶ 14, 19.[17] The ban also instructs "all persons with whom same-sex couples interact, *including their own children*," that their relationship is "less worthy." *Windsor*, 133 S. Ct. at 2696 (emphasis added); *see also Brown v. Board of Education of Topeka*,

---

[17] For example, if Nancy and Jane should separate without having been married, A.S.M. may be left with the support of only one parent, and would be denied West Virginia's predictable and orderly structure for effecting a separation and determining matters of custody, visitation, child support, property, alimony, and maintenance. *See, e.g.*, W. Va. Code §§ 48-9-102, 42-3-1, 48-7-103, 48-8-101, 48-11-101, 48-14-101. Likewise, if Nancy or Jane should die, A.S.M. may be denied survivor benefits reserved to children of married parents.

347 U.S. 483, 494 (1954) (noting dignitary injury caused by segregating children "solely because of their race [which] generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone," and "the impact is greater when it has the sanction of the law"). Disparate treatment of children of unmarried parents based on the conduct or status of their parents violates the Equal Protection Clause. *Weber v. Aetna Cas. & Sur. Co.*, 406 U.S. 164, 175 (1972); *Gomez v. Perez*, 409 U.S. 535, 538 (1973); *Mathews v. Lucas*, 427 U.S. 495, 505 (1976); *Clark v. Jeter,* 486 U.S. 456 (1988); *Levy v. Louisiana*, 391 U.S. 68 (1968). States have no "legitimate state interest" in depriving children of equal protection solely because of the circumstances of their birth. *Weber*, 406 U.S. at 175; *Gomez*, 409 U.S. at 538; *Mathews*, 427 U.S. at 505. By preventing A.S.M. ever from having married parents based on the sex and sexual orientation of his parents, over which he has no control, West Virginia has violated A.S.M.'s right to equal protection.

## CONCLUSION

For the foregoing reasons, Plaintiffs request the Court enter summary judgment in their favor.

Dated: December 30, 2013

Respectfully submitted,

CASIE JO MCGEE and SARAH ELIZABETH ADKINS, et al.

By Counsel:

/s/ John H. Tinney Jr.
THE TINNEY LAW FIRM, PLLC
John H. Tinney, Jr. (WVSB #6970)
Heather Foster Kittredge (WVSB #8543)

P.O. Box 3752
Charleston, West Virginia 25337-3752
Phone: (304) 720-3310
Fax: (304) 720-3315
JackTinney@tinneylawfirm.com
HKittredge@tinneylawfirm.com

LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
Elizabeth L. Littrell (*pro hac vice* pending)
730 Peachtree Street, N.E.
Suite 1070
Atlanta, Georgia 30308-1210
Phone: (404) 897-1880
Fax: (404) 897-1884
blittrell@lambdalegal.org

Karen L. Loewy (*pro hac vice* pending)
120 Wall Street, 19th Floor
New York, New York 10005-3904
Phone: (212) 809-8585
Fax: (212) 809-0055
kloewy@lambdalegal.org

Camilla B. Taylor (*pro hac vice* pending)
105 West Adams, 26th Floor
Chicago, Illinois 60603-6208
Phone: (312) 663-4413
Fax: (312) 663-4307
ctaylor@lambdalegal.org

JENNER & BLOCK LLP
Paul M. Smith (*pro hac vice* pending)
Lindsay C. Harrison (*pro hac vice* pending)
Luke C. Platzer (*pro hac vice* pending)
R. Trent McCotter (*pro hac vice* pending)
1099 New York Avenue, NW Suite 900
Washington, D.C. 20001-4412
Phone: (202) 639-6000
Fax: (202) 639-6006
psmith@jenner.com
lharrison@jenner.com
lplatzer@jenner.com
rmccotter@jenner.com

21

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of December 2013, I effected service upon counsel for Defendants by electronically filing the foregoing with the Clerk of the Court using the CM/ECF system.

Elbert Lin, Esq.
Julie Ann Warren, Esq.
Office of the Attorney General
State Capitol Building 1, Room E-26
Charleston, WV 25305
Counsel for the State of West Virginia
elbert.lin@wvago.gov
julie.warren@wvago.gov

Lee Murray Hall
Sarah A. Walling
JENKINS FENSTERMAKER
P. O. BOX 2688
Huntington, WV 25726-2688
Phone: (304) 523-2100
Fax: (304) 523-2347
lmh@jenkinsfenstermaker.com
saw@jenkinsfenstermaker.com
*Counsel for Defendant Karen S. Cole*

Charles R. Bailey
Michael W. Taylor
BAILEY & WYANT
P. O. Box 3710
Charleston, WV 25337-3710
Phone: (304) 345-4222
Fax: (304) 343-3133
cbailey@baileywyant.com
mtaylor@baileywyant.com
*Counsel for Defendant Vera J. McCormick*

December 30, 2013

       /s/ John H. Tinney Jr.     .
THE TINNEY LAW FIRM, PLLC
John H. Tinney, Jr. (WVSB #6970)
P.O. Box 3752
Charleston, West Virginia 25337-3752
Phone: (304) 720-3310
Fax: (304) 720-3315
JackTinney@tinneylawfirm.com

22