**IN THE UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

CASIE JO MCGEE and SARAH ELIZABETH ADKINS; JUSTIN MURDOCK and WILLIAM GLAVARIS; and NANCY ELIZABETH MICHAEL and JANE LOUISE FENTON, individually and as next friends of A.S.M., minor child,

Plaintiffs,

v. CIVIL ACTION NO. 3:13-24068

KAREN S. COLE, in her official capacity as CABELL COUNTY CLERK; and VERA J. MCCORMICK, in her official capacity as KANAWHA COUNTY CLERK,

Defendants,

and

STATE OF WEST VIRGINIA

Intervenor Defendant.

**MEMORANDUM OPINION AND ORDER**

Plaintiffs have moved for attorneys' fees and costs. Defendant Clerks and the State oppose the motion and the West Virginia Association of County Officials has moved to file an amicus brief in support of Defendant Clerks. For the reasons set forth below, Plaintiffs' Motion for Attorneys' Fees, Expenses, and Costs (ECF No. 145) is **GRANTED IN PART** and **DENIED IN PART**. Plaintiffs' Motion for Extension of Time in Which to File Reply in Support of Motion for Attorneys' Fees, Expenses, and Costs (152) is **DENIED AS MOOT**. The West Virginia Association of County Officials' Motion for Leave to File Brief of Amicus Curiae (154) is **GRANTED**.

## I. Background

Plaintiffs brought this action pursuant to Title 42, Section 1983 of the U.S. Code to challenge West Virginia's ban on same-sex marriage. Plaintiffs, three same-sex couples and a minor child, sued Karen S. Cole, in her official capacity as Cabell County Clerk, and Vera J. McCormick, in her official capacity as Kanawha County Clerk. County clerks are responsible for issuing marriage licenses in their respective counties and recording marriages that take place outside of West Virginia. They are responsible for ensuring that marriage licenses comply with state law, including, at the time this suit was filed, West Virginia's ban on same-sex marriage.

The Plaintiff couples in this case each sought a marriage license from one of the clerks, and each was denied. Accordingly, they filed this suit seeking declaratory relief, asking the Court to declare as unconstitutional West Virginia Code Sections 48-2-104, 48-2-401, and 48-2-603, and all other sources of West Virginia law prohibiting same-sex marriage. Section 48-2-104 dictates the contents of a state marriage license, Section 48-2-401 governs persons authorized to perform marriages, and Section 48-2-603 prohibits recognition of same-sex marriages executed in other states. Plaintiffs also sought an injunction to prohibit Defendant Clerks from enforcing these laws. The State of West Virginia intervened in the case to defend the constitutionality of its laws.

Defendant Clerks and the State each filed a motion to dismiss. The Court denied the Clerks' motions. The Court found that Plaintiffs did not have standing to challenge the non-recognition statute, and thus granted the State's motion to dismiss. This resulted in dismissal of Plaintiffs' claim challenging West Virginia Code Section 48-2-603. *See* ECF No. 56.

Plaintiffs filed a motion for summary judgment on their remaining claims. Defendant Clerks and the State then filed their own motions for summary judgment. The State also filed a second motion to dismiss. The Court stayed the case pending a decision from the U.S. Circuit

Court of Appeals for the Fourth Circuit in *Bostic v. Schaefer*, a case challenging Virginia's ban on same-sex marriage. After the Fourth Circuit held that Virginia's ban was unconstitutional, the Court lifted the stay in the present case and granted Plaintiffs' motion for summary judgment. The Court denied Defendants' and the State's motions for summary judgment, and denied the State's motion to dismiss. The Court declared Sections 48-2-104 and 48-2-401 unconstitutional in so far as they prohibited same-sex marriage. The Court also enjoined Defendant Clerks from enforcing these statutes to the extent that they were declared unconstitutional. *See* ECF No. 139. Thereafter, Plaintiffs moved for attorneys' fees and costs.

## II. Statement of the Law

Under the "American Rule," parties generally bear their own fees and costs. *Key Tronic Corp. v. United States*, 511 U.S. 809, 815 (1994). Congress has, however, carved out several exceptions to this rule through fee-shifting statutes. One such statute is the Civil Rights Attorney's Fees Award Act, also known as Section 1988, which provides that in a civil rights action brought under Section 1983, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b) (2012). "[A] prevailing plaintiff 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'" *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (quoting S. Rep. No. 94–1011, at 4 (1976)). Where the prevailing party seeks an attorneys' fee "so outrageously excessive so as to shock the conscience of the court . . . a complete denial of any fee award is justified." *Fair Housing Council of Greater Washington v. Landow*, 999 F.2d 92, 94 (4th Cir. 1993). Barring these or other rare circumstances, attorneys' fees should be granted to compensate the successful attorneys and "'ensure effective access to the judicial process' for persons with civil rights grievances." *Lefemine v. Wideman*, 758 F.3d 551, 555 (4th

Cir. 2014) (quoting *Hensley*, 461 U.S. at 429).

**A. Calculation of Fee**

To calculate a reasonable fee, the Court must follow a three-step process:

> First, the court must determine the lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate. Second, the court must subtract fees for hours spent on unsuccessful claims unrelated to successful ones. [Third], the court should award some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff.

*Jones v. Southpeak Interactive Corp. of Delaware*, 777 F.3d 658, 675-76 (4th Cir. 2015) (internal quotation marks and citations omitted).

Turning first to the lodestar calculation, the Court must determine a reasonable number of hours spent on the case and a reasonable rate for each attorney involved. The party requesting attorneys' fees bears the burden of producing evidence of the hours expended. *Hensley*, 461 U.S. at 433. Where the prevailing attorneys have failed to adequately document their hours, the Court may reduce the fee award. *Id.* Attorneys should use "billing judgment" when requesting fees. *Id.* at 434. "[H]ours that are excessive, redundant, or otherwise unnecessary" should be excluded. *Id.*

Whether certain hours are reasonable is often highly dependent on the nature of the issues litigated. In some cases, attorneys may reasonably request fees for hours spent on public relations, including press conferences and media appearances. In an employment discrimination action, for example, the U.S. Court of Appeals for the Ninth Circuit allowed fees for hours spent on public relations in an attempt to convince the defendants to negotiate a consent decree. *Davis v. City & County of San Francisco*, 976 F.2d 1536, 1545 (9th Cir. 1992), vacated in part on other grounds, 984 F.2d 345 (1993). The court held: "Where the giving of press conferences and performance of other lobbying and public relations work is directly and intimately related to the

successful representation of a client, private attorneys do such work and bill their clients. Prevailing civil rights plaintiffs may do the same." *Id.* Where public relations work does not directly impact litigation but serves some other purpose, such hours are not reasonable and will not be included in the lodestar calculation. *See Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 176 (4th Cir. 1994) (affirming disallowance of fees for hours spent on press and publicity work where attorneys' efforts were intended to mitigate public relations damage to the plaintiff corporation).

Reasonable rates "are to be calculated according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel." *Blum v. Stenson*, 465 U.S. 886, 895 (1984). The prevailing party must produce evidence, in addition to affidavits of the party's own attorneys, demonstrating that the rates requested correspond to "those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Id.* at 895 n. 11. The relevant community is the one in which the court sits. *Nat'l Wildlife Fed'n v. Hanson*, 859 F.2d 313, 317 (4th Cir. 1988). In certain cases, however, where the nature of the litigation indicates that no attorney with the specialized skills required is available in the community, different rates may be reasonable. *See id.* There are "two questions to be asked in determining whether an exception to the general rule should be granted: are services of like quality truly available in the locality where the services are rendered; and did the party choosing the attorney from elsewhere act reasonably in making that choice?" *Id.* Once the Court has determined a reasonable rate for each attorney, the Court must multiply this figure by the number of hours reasonably expended to calculate the lodestar.

A plaintiff need not succeed on all her claims to be awarded attorneys' fees. *See Hensley*,

461 U.S. at 433. This brings the Court to the second step in the calculation, reducing the lodestar to reflect unsuccessful claims. *See Jones*, 777 F.3d at 676. There is no precise formula for making this reduction. *Hensley*, 461 U.S. at 436. The Court may not simply decrease the fee award by the percentage of Plaintiff's claims that were unsuccessful. *Jones*, 777 F.3d at 676. Rather, the Court "may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." *Hensley*, 461 U.S. at 436-37.

The third and final step in the calculation is equally imprecise. The Court must determine what percentage of the calculated fee to award based on "the degree of success obtained." *Id.* at 436. The Supreme Court has identified the measure of Plaintiff's success as the "the most critical factor" to the overall computation of a reasonable fee award. *Id.* The Court must consider the relief obtained compared to the relief initially sought by the plaintiff. *McAfee v. Boczar*, 738 F.3d 81, 93 (4th Cir. 2013). The Court should "reduce the award if 'the relief, however significant, is limited in comparison to the scope of the litigation as a whole.'" *Id.* at 92 (quoting *Hensley*, 461 U.S. at 439-40).

**B. Distribution of Fee**

Once the Court has calculated a reasonable fee, it must next determine how to distribute liability for the fee among the defendants. The distribution of fees in this case turns on whether the suit is properly considered an *Ex parte Young* case against the state of West Virginia, or rather one against Cabell and Kanawha counties.

Under the doctrine of *Ex parte Young*, a plaintiff may challenge the constitutionality of a state law or local ordinance, policy, or custom by bringing suit against an official, in her official capacity, for enforcing or administering that law or rule. *Ex parte Young*, 209 U.S. 123, 155-56 (1908). If the plaintiff succeeds, any judgment against the official in her official capacity

"imposes liability on the entity that [s]he represents." *Brandon v. Holt*, 469 U.S. 464, 471 (1985). This rule applies to attorneys' fees as well as any judgment on the merits. *See id.* at 472. Moreover, contrary to the State's argument in this case, this rule applies equally to states and local entities. In *Hutto v. Finney*, 437 U.S. 678 (1978), the Supreme Court held that "Congress undoubtedly intended to . . . authorize fee awards payable by the States when their officials are sued in their official capacities." *Hutto*, 437 U.S. at 693-94; *see West Virginians for Life, Inc. v. Smith*, 952 F. Supp. 342, 348 n. 4 (S.D. W. Va. 1996) ("A § 1988 fee award against a state officer sued in his official capacity imposes liability on the state."). The Court explained that a state properly sued through a state official in an *Ex parte Young* action has no immunity from subsequent fees awarded under Section 1988. *Hutto*, 437 U.S. at 696-98. Accordingly, although fees awarded in an *Ex parte Young* action are assessed against the defendant official, they are ultimately the responsibility the state or local entity on whose behalf the official acts. *Id.* It is thus necessary to determine the entity that a defendant official represents in order to identify the entity that will be responsible for attorneys' fees.

Although the defendant clerks here are, in name, county officials, such officials are sometimes considered state agents for purposes of a specific case. Several courts have held that local and county officials may be considered state officials for purposes of an *Ex parte Young* suit where they are responsible for enforcing or administering state law rather than local or county policies. In *Bostic v. Schaefer*, 760 F.3d 352 (4th Cir. 2014), same-sex couples challenged Virginia's same-sex marriage ban by suing, among others, a city clerk who had denied one of the couples a marriage license. *Bostic*, 760 F.3d at 367, 371. The U.S. Court of Appeals for the Fourth Circuit held that the clerk was a proper defendant through which to sue the state of Virginia under *Ex parte Young* because he was responsible for enforcing Virginia's same-sex marriage ban.

*See id.* at 371 & n. 3. The Court explained that the clerk's action in denying the plaintiffs' application for a marriage license was "clearly attributable to the state." *Id.* at 371 n. 2. The U.S. Courts of Appeals for the Fifth, Sixth, and Seventh Circuits have also held that a county or local official may be properly considered an agent of the state where that official is sued for enforcing a state law, rather than a discretionary rule or local policy. *See Brotherton v. Cleveland*, 173 F.3d 552, 566 (6th Cir. 1999) ("Where county officials are sued simply for complying with state mandates that afford no discretion, they act as an arm of the State."); *Bethesda Lutheran Homes and Servs., Inc. v. Leean*, 154 F.3d 716, 718 (7th Cir. 1998) (explaining that where a municipality is forced to follow an unconstitutional state law, it is the state law and not the municipality that is responsible for the plaintiff's injury); *Echols v. Parker*, 909 F.2d 795, 801 (5th Cir. 1990) ("[W]hen a state statute directs the actions of an official, as here, the officer, be he state or local, is acting as a state official.").

Thus, if the Court finds that Defendant Clerks were sued for enforcing West Virginia state law they may properly be considered state officials for purposes of this matter. As such, any fees awarded would be assessed against the clerks in their official capacities, to be paid by the State of West Virginia. If the Court instead finds that the clerks were sued for administering a county rule or policy, they would properly be considered agents of their respective counties, not of the State. In that case, it is the counties and not the State that would be liable for the judgment and any attorneys' fees assessed against the clerks. *Brandon*, 469 U.S. at 472; *see also Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690, 694 (1978) (explaining that local government entities are liable under Section 1983 where local policy or custom causes injury).

## III. Discussion

### A. Calculation of Fee

Plaintiffs seek $342,576.25 in attorneys' fees for 1,033.25 hours, including 74.1 hours of paralegal time. Defendant Clerks strongly oppose Plaintiffs' request. They argue that several special circumstances justify denying a fee award altogether. First, they claim that Plaintiffs' proposed fee is so excessive as to shock the conscience. They also argue that they have done no wrong but were merely fulfilling their duty as officers of the state. Furthermore, the clerks contend that filing this action was unnecessary given that Virginia's same-sex marriage case "would unquestionably be decided and appealed to the Fourth Circuit long before this action progressed past its infancy." They also claim that this lawsuit was "manufactured" by Plaintiffs' counsel. Finally, Defendant Clerks argue that imposition of attorneys' fees on the clerks and their respective counties is inherently unjust because they were not responsible for enacting the challenged laws. ECF No. 153

The State also challenges the fee request, arguing that no fee is reasonable in this case because "[s]ame-sex marriage is a changing area of law" and "[t]here was no question of constitutionality" when the same-sex marriage ban was passed. Thus "it would be unfair and unjust to require payment of fees by state and county officials acting in good faith" to enforce the ban. ECF No. 155.

An impressive battalion of lawyers, eleven attorneys from three firms, ably represented Plaintiffs to successfully prosecute an important civil rights claim, for their benefit and that of many other West Virginians. One of many cases cascading from the United States Supreme Court's decision in *United States v. Windsor*, 133 S. Ct. 2675 (2013), this action resulted in a significant victory for Plaintiffs, though the tide of success in other states, the Circuit, and

ultimately the Supreme Court surely helped carry them. Although same-sex marriage was a changing area of law when this case was filed, and Plaintiffs' counsel sought out plaintiffs in West Virginia to file this suit, this case constitutes a proper suit under Section 1983 to vindicate Plaintiffs' civil rights and overturn unconstitutional legislation. That the clerks and the State acted in good faith in enforcing this legislation is irrelevant. *See Lefemine*, 758 F.3d at 557 ("[W]e, and our sister circuits, have repeatedly rejected good faith as a special circumstance justifying the denial of Section 1988 attorneys' fees."). Furthermore, the fee requested is not so extreme as to shock the conscience and warrant the denial of attorneys' fees. The Court thus finds that Plaintiffs are entitled to an award of fees and costs. The Court also finds, however, that the hourly rates sought and total hours expended are excessive.

First, the Court finds that some of Plaintiffs' attorneys are not entitled to the hourly rates they submitted. This Court is obligated to apply local market rates unless some circumstance justifies looking to a different or larger market. *Nat'l Wildlife Fed'n*, 859 F.2d at 317. Though each attorney provided some support for the rates each seeks, those rates are well above the relevant market within which this Court sits. Lawyers from the two nationally recognized firms of Jenner and Block and Lambda Legal chose to search for plaintiffs and venues in West Virginia to bring this action. While it is admirable that these firms initiated this civil rights litigation and brought to it a level of expertise and stature that may not have been available from in-state firms, the fact remains that they sought out West Virginia plaintiffs and a West Virginia forum. They were not sought out by state residents who found it difficult to obtain representation for these claims in West Virginia. They should not expect hourly rates to be based upon rates from large metropolitan markets, such as their home cities, or schedules like the *Laffey* Matrix. Therefore,

the Court will consider its knowledge of, and experience with, reasonable attorneys' fees and hourly rates within this market.

The attorneys with Jenner and Block contributed a substantial portion of the total hours, through four attorneys. In his affidavit in support of Jenner and Block attorneys, Mr. Smith relies on the *Laffey* Matrix[1] and points out that the firm's usual rates for these attorneys is even higher. The Matrix is updated annually, and new rates began on June 1, 2014. Mr. Smith submitted 22.5 hours at hourly rates of $771 and $789, covering the periods before and after June 1, 2014. His credentials were impressive and command a high hourly rate. His firm was primarily responsible for drafting most of the pleadings and submissions, in particular the briefing on summary judgment and other dispositive motions, which comprised the bulk of the work performed in the case as there was no discovery. Ms. Harrison, an experienced litigator with Jenner and Block, contributed over ninety hours and supervised the work of two associates, Mr. McCotter and Mr. Tarasen. She seeks an hourly rate of $567 through June 1, 2014, and $655 thereafter. Mr. McCotter worked 95.5 hours and Mr. Tarasen 147.75 hours, each at hourly rates of $320 and $328.

While the Matrix serves a useful purpose, its applicability in this market is limited. This Court has contemporaneously determined hourly rates in other cases, and considered hourly rates set by colleagues in the state and federal courts in this area. The Court sets Mr. Smith's rate as $500 per hour; this rate coincides with a highly competent, experienced senior litigator's rates and reflects the more limited role of Mr. Smith in this case. For Ms. Harrison, the Court fixes an hourly rate of $400, commensurate with an experienced and seasoned litigator managing

[1] The *Laffey* Matrix is a "schedule of attorneys' fees, first developed based on information about the prevailing rates charged by federal litigators in the District of Columbia" which is updated annually based on the Consumer Price Index. *Rooths v. District of Columbia*, 802 F. Supp. 2d 56, 61 (D.D.C. 2011). Federal courts in the District of Columbia use it as a starting point in setting attorneys' fees. *Id.* at 62.

subordinate staff. For the associates, each with less than five years of experience, the hourly rate of $250 is awarded. Since all of the work was performed between mid-2013 and spring 2015, the Court sees no need to apply any different rates or adjustments. Jenner and Block also seeks $175 per hour for paralegal time; the Court sets a rate of $100 per hour, consistent with the local market.

Turning to the Lambda Legal attorneys, their work was also substantial, totaling over 400 hours. Lambda Legal has considerable experience in this particular area of civil rights, serving as advocates for gay and lesbian rights. Its three lawyers assigned here—Ms. Taylor, Ms. Loewy, and Ms. Littrell—ask for hourly rates of $350, $325, and $300, respectively. Considering their length of experience and specific expertise, and the nature of their responsibilities in this matter, the Court reduces their hourly rates to $325, $300, and $275, respectively.

Finally, the Court addresses the fees requested by the Tinney Law Firm. Led primarily by John Tinney, Jr., the firm used four attorneys for a variety of purposes, contributing about 150 hours at rates from $205 to $300 per hour. The firm's paralegal also spent 60.6 hours on the case, seeking a rate of $100 per hour, which is typical. Mr. Tinney has been engaged in complex litigation throughout this state for twenty years, and enjoys a solid representation. His associate, Ms. Kittredge, is less experienced, but seeks the lower rate of $225 per hour. The Court approves the rates he seeks for his firm.

As the Court understands its duty, it must determine the lodestar figure by multiplying these hourly rates times the number of hours reasonably expended. This task is more difficult; the Court always hesitates to question, much less reject, a lawyer's statement of the time spent representing a client. Here, the Court does not doubt the time keeping performed by counsel and will not nitpick their records to exclude particular entries for duplication or redundancy. Nevertheless, the Court must adjust the fee award to reflect that more lawyers than were

reasonably needed spent substantially more hours than reasonably necessary to represent Plaintiffs.

First, Plaintiffs are not entitled to the 32 hours of time attributable to press conferences and media analysis under the *Rum Creek* standard. *See Rum Creek*, 31 F.3d at 176. The Court thus subtracts 32 hours for time spent on media relations. *See* ECF No. 155, Ex. 16.

Second, the Court observes that Plaintiffs' attorneys rightfully point out their experience with similar cases as one of the justifications for their higher hourly rates. The fact is that several of these lawyers worked on the same issues in parallel cases brought since *Windsor* and on related issues even before that. Logically then, their prior knowledge should have helped them avoid inefficient or unnecessary work. Further, with this many relatively seasoned, senior litigators, there was little need for several lawyers to review everything prepared for Plaintiffs or filed by Defendants and the State. The constitutional challenges brought just after the *Windsor* decision provided a clear path and resulted in a steady stream of favorable decisions in federal and state courts, which Plaintiffs quickly forwarded on to this Court.

There was no discovery, only one brief hearing, and only two rounds of substantial briefing for early motions to dismiss and later cross-motions for summary judgment. Each firm bills for a large number of hours with respect to each major activity. Apparently, each firm undertook a supervisory role in most aspects of the Plaintiffs' case, though all of the substantive work of subordinates was already reviewed by a senior attorney. This approach strikes the Court as lawyers working by committee, rather than delineating and delegating to share the workload. Consequently, the Court reduces the lodestar amounts for each attorney to one-third.

Next, the Court must reduce the fee award to account for any unsuccessful claims. All parties agree that the Plaintiffs were not successful on their "non-recognition claim." Plaintiffs

concede that 31 hours should be subtracted from their total. ECF No. 156, Ex. 3. The Court thus subtracts the 31 hours expended by Plaintiffs' counsel on the non-recognition claim.

The Court's lodestar calculations are as follows:

| Attorney/Paralegal | Hours Requested | Hours Awarded[2] | Rate | Total Fee |
|---|---|---|---|---|
| Paul Smith | 22.5 | 7 | $500 | $3,500 |
| Lindsay Harrison | 91.25 | 29 | $400 | $11,600 |
| R. Trent McCotter | 95.75 | 32 | $250 | $8,000 |
| Nicholas Tarasen | 147.75 | 45 | $250 | $11,250 |
| Camilla Taylor | 155.2 | 51 | $325 | $16,575 |
| Karen Loewy | 118.1 | 38 | $300 | $11,400 |
| Elizabeth Littrell | 157.7 | 52 | $275 | $14,300 |
| John Tinney, Jr. | 92.9 | 28 | $300 | $8,400 |
| James Tinney | 25.6 | 5 | $240 | $1,200 |
| Heather Foster Kittredge | 52 | 16 | $225 | $3,600 |
| John Cecil | 0.4 | 0 | $205 | $0 |
| Cheryl Olson | 13.5 | 5 | $100 | $500 |
| Nodgie Kennedy | 60.6 | 18 | $100 | $1,800 |
| | | | Total: | $92,125 |

This total number represents the lodestar for all attorneys' and paralegal fees.

[2] This column reflects the total number of hours actually awarded to each attorney and paralegal, rounded to the nearest whole number, after subtracting the hours spent on the non-recognition claim, *see* ECF No. 156, Ex. 3, and media relations, *see* ECF No. 155, Ex. 16, and reducing the hours by two-thirds.

Finally, the Court must assess the remaining factors which may bear upon setting the fee award. Here, the Court finds that the considerations outlined in *Hensley* do not alter the award. The factors relating to counsels' time, skill, experience, and relation to the clients are embodied in the Court's determination of the lodestar. The novelty of the issues and undesirability of the case are likewise of lessened import here due to the tide of similar decisions since *Windsor*. The remaining factors are not materially significant. The Court must also consider the relief obtained and reduce the award if it is less than that initially sought by Plaintiffs. *McAfee*, 738 F.3d at 92-93. The Court has already reduced the hours in the lodestar to compensate for the time spent on Plaintiffs' failed non-recognition claim. As to the remaining claims, Plaintiffs achieved complete success. In their complaint, Plaintiffs sought a declaration that West Virginia's laws prohibiting same-sex marriage are unconstitutional and an injunction preventing Defendant Clerks from enforcing those laws. ECF No. 8. The Court granted Plaintiffs their requested relief. Accordingly, no further adjustment of the lodestar is appropriate.

**B. Calculation of Costs**

Plaintiffs have also requested $7,679.64 in costs and expenses. The Court has reviewed the itemized cost charts and finds the request reasonable. The Court awards Plaintiffs $7,679.64 for costs and expenses.

**C. Distribution of Fees and Costs**

Plaintiffs sued the Cabell County Clerk and Kanawha County Clerk in their official capacities. The state of West Virginia then intervened to defend the constitutionality of the challenged statutes pursuant to Title 28, Section 2403(b) of the U.S. Code. Plaintiffs did not sue any state officials. To identify the entity responsible for the fees and costs in this matter, the Court must determine whether Defendant Clerks represented the State or their respective counties

at the time they denied marriage licenses to Plaintiff couples.[3] *See Brandon*, 469 U.S. at 471. The clerks argue that they were "officers of the State of West Virginia" and were enforcing West Virginia law when they denied marriage licenses to Plaintiffs. ECF No. 153. They maintain that they have done nothing more than obey "statutes enacted by the West Virginia Legislature, as the duly elected representatives of the citizens of the State of West Virginia." They contend that they should not be held liable for upholding the State's laws. Instead, to the extent that Plaintiffs are entitled to any fees, the State of West Virginia is liable and the fees "should be satisfied from the State's budget." ECF No. 153.

The State vehemently disagrees. First, the State contends that it is immune from attorneys' fees under the Eleventh Amendment because none of the three exceptions to state sovereign immunity apply: the State has not waived immunity, Congress has not abrogated immunity, and Plaintiffs have not brought a proper *Ex parte Young* action against a state official. According to the State, Defendant Clerks cannot be considered state officials under West Virginia law.[4] The State concedes, however, that had Plaintiffs sued a state official "there would be no

[3] Plaintiffs argue that the State and Defendant Clerks should be held jointly and severally liable for attorneys' fees. ECF No. 156. Although this is sometimes an appropriate approach to distributing liability for fees, it is not applicable in this case. Here, Defendant Clerks were sued in their official capacities. As such, attorneys' fees and costs will be assessed against them in name only; they will not be held personally liable for paying those fees and costs. *See West Virginians for Life*, 952 F. Supp. at 348 n. 4. Instead, the government entity that the clerks represented at the time of Plaintiffs' injury will be responsible for payment. This entity is either Cabell and Kanawha counties, or the state, but not both. Thus only one government entity will be responsible for the attorneys' fees and costs assessed.

[4] The State argues that Defendant Clerks cannot be considered state officials because counties are not considered arms of the state under West Virginia law. Regardless of how West Virginia classifies its counties, county officials may be considered state officials for the limited purposes of liability in an *Ex parte Young* case. *See Bostic*, 760 F.3d at 371 n. 2. Further, the State, relying on *Bockes v. Fields*, 999 F.2d 788, 791 (4th Cir. 1993), maintains that if county officials "truly have no discretion under a state law or policy, they simply should not have been sued in the first place." ECF No. 155. The State's reliance on *Bockes* is misplaced. In *Bockes*, the plaintiff attempted to place liability on a county for the decision of a county board that acted

immunity and the fee award could be directed in part or in whole against the State in this Court's discretion." ECF No. 155. Alternatively, the State argues that even if it is not immune, no attorneys' fees should be awarded against it. The State contends that it is not liable to Plaintiffs for the judgment and thus it should not be liable to them for attorneys' fees.

The Court agrees with Defendant Clerks. Sections 48-2-104 and 48-2-401 of the West Virginia Code were state laws prohibiting same-sex marriage. Each Plaintiff couple attempted to obtain a marriage license, and each was denied by one of the defendants pursuant to these state laws. *See* ECF No. 8. The State has not provided, and the Court has not found, any evidence that Defendant Clerks were administering county rules or policies rather than state law. Moreover, the clerks had no discretion to disregard state law and issue marriage licenses to the plaintiffs. West Virginia law specifically forbids county clerks from "issu[ing] a marriage license contrary to law." W. Va. Code § 48-2-502 (2001). Any clerk who issues such a license "shall be punished by a fine not exceeding five hundred dollars, or by confinement in the county or regional jail for not more than one year, or by both." *Id.* It is clear that Defendant Clerks were required by state law to deny marriage licenses to the plaintiffs and administered state law when they did so. The clerks were thus acting as state agents, rather than county officials, at the time of Plaintiffs' injuries. Accordingly, they are considered state officials for the purposes of this *Ex parte Young* suit. *See Bostic*, 760 F.3d at 371 n. 2; *Brotherton*, 173 F.3d at 566.

---

pursuant to state policy. The court held that the county was not liable because the decision was the result of state, not county, policy. In contrast, construing the county clerks in the present case as state officials would place liability on the entity actually responsible for enacting the challenged laws—the State. Moreover, the clerks sued were the officials responsible for enforcing West Virginia's unconstitutional ban on same-sex marriage. They denied marriage licenses to the plaintiffs and thereby caused Plaintiffs' injuries. Defendant Clerks were thus proper officials to sue in order to challenge the State's ban on same-sex marriage, even though other officials could have been proper defendants as well.

Furthermore, although not named as a defendant in this case, the State was clearly the intended target of this litigation. *See Hutto*, 437 U.S. at 700 ("[S]uits brought against individual officers for injunctive relief are for all practical purposes suits against the State itself."). Not only did the Court grant an injunction preventing the clerks from administering the same-sex marriage ban, it declared two of the State's laws unconstitutional. This declaration is part and parcel of the total relief obtained and shows that the State, not the clerks, is responsible for the legislation that violated Plaintiffs' civil rights. For the foregoing reasons, the attorneys' fees assessed against Defendant Clerks will be the responsibility of the State of West Virginia.

**D. Total Fees and Costs**

Plaintiffs are awarded $92,125 in attorneys' fees, including paralegal fees, and $7,679.64 in costs and expenses. All fees, costs, and expenses are assessed against Defendants in their official capacities as agents of the State of West Virginia.

**Conclusion**

As set forth above, Plaintiffs' Motion for Attorneys' Fees, Expenses, and Costs (ECF No. 145) is **GRANTED IN PART** and **DENIED IN PART**. Plaintiffs' Motion for Extension of Time in Which to File Reply in Support of Motion for Attorneys' Fees, Expenses, and Costs (152) is **DENIED AS MOOT**. The West Virginia Association of County Officials' Motion for Leave to File Brief of Amicus Curiae (154) is **GRANTED**.

ENTER: July 16, 2015

ROBERT C. CHAMBERS, CHIEF JUDGE